**William H. Bowers et al., Defendants in Error, v. Nellie E. Simpson, Plaintiff in Error.**

### Gen. No. 15,318.

BROKERS AND FACTORS—*when not entitled to real estate commissions.* In order to sustain a recovery by a broker of real estate commissions it must appear that such broker was the procuring cause of the sale effected.

Error to the Municipal Court of Chicago; the Hon. HUGH R. STEWART, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1909. Reversed. Opinion filed March 3, 1911.

MASON & WYMAN, for plaintiff in error.

EDWARD J. KELLY, for defendants in error.

MR. JUSTICE CLARK delivered the opinion of the court.

Suit was brought by the defendants in error against the plaintiff in error to recover the sum of $200 for commissions alleged to have been earned on the sale of certain property. The agreement sued on reads as follows:

"March 17, 1908.

W. H. BOWERS & Co.,
    Chicago, Ill.

I hereby give you the exclusive sale of the following described property, to-wit: 3533 Wabash Ave., Chicago, for six months from date and thereafter until withdrawn, and agree to pay you the regular Real Estate Board rules commission, provided the sale is made. Price $7,200.

(Signed)    NELLIE E. SIMPSON."

It is admitted that a sale of the property was made by Mrs. Simpson to F. A. Dennison in May, 1908, for $7,000. She insists, however, that the defendants in error did not procure the sale and that before the sale was consummated or even contemplated she had withdrawn the authorization given Bowers & Co.

The transaction, so far as Bowers & Co. are concerned, was carried on by Richard M. O'Brien of that firm. The testimony in regard to the withdrawal was given by Mrs. Simpson herself, and her daughter, on the one side, and Mr. O'Brien on the other.

Mrs. Simpson testified:

"I said to Mr. O'Brien 'We have given up the sale of our house.' He said 'That is all right, Mrs. Simpson.' I said 'Have you been to any expense, Mr. O'Brien, since you have had this property?' He said, 'No.' I said, 'Did you advertise?' He said, 'Yes.' I said, 'Let me see the advertisement?' He showed it

to me on Wabash Avenue, between Thirty-fifth and Thirty-sixth streets, stone front house, etc., price $7,200. I said 'We have been very unsettled in selling our house and we wish to give it up.' He said, 'That's all right, Mrs. Simpson, no expense attached to it.' I said, 'Is it necessary for me to have my contract; my papers,' and he said, 'No.' I thanked him very much.''

She testified on cross-examination that this conversation occurred several weeks before the sale of the house. Her daughter, Miss Simpson, corroborates her mother and says that the conversation occurred ''about four to six weeks'' after this contract was made.

Mr. O'Brien's testimony in substance is as follows:

''I think I was alone in the office when Mrs. Simpson and her daughter came in. Mrs. Simpson asked how the property on Wabash Avenue was coming on and I said, 'Not as lively as we might hope;' that Wabash Avenue was not selling as actively as we hoped for, but we were advertising, and I showed her the book in which the advertisement was. She said it was getting on close to house cleaning time and she did not want to be disturbed by anyone being sent there. I says, 'That's all right,' that we wouldn't send anyone to the house without first communicating with her by telephone. I said I have one or two persons interested —a Mr. Smith, and he promised that he would inspect your house before this time. She said that she did not want to sell the house now until later in the summer. I said to her that was her privilege, if she wished to withdraw the house that was her privilege, but we would not send anyone to her house during the time she was cleaning, without first notifying her. Then she says, 'You have the contract,' and I says, 'Yes, we have the exclusive sale contract for six months on the property, and feel confident that we can sell it during that time.' She said, 'You haven't sold it yet?' I said, 'That's true.' She says not to send anyone to her house. I said, 'If you wish to withdraw the contract, that's your privilege at any time, but we will not send anyone without first notifying you, and if the

sale is made during the time, of course, we want the same per cent. as before.' We had spent some money advertising. She says, 'What's your expense?' I says, 'I can't tell you, because the bookkeeper isn't here. I kept no account of that more than writing the ads.' She says, 'I am willing to pay all expenses of advertising.' I says, 'As I explained to you, where we have the exclusive sale of a piece of property, we at no time request owners of the property to pay for the advertising.'"

Cross-examination.

"I told her if she wanted not to sell the property, that was her privilege to withdraw the contract at any time, if she wanted to retain the property. She did not say she wanted to withdraw the contract.

Q. How did you come to mention that at all? A. When she raised the point that I had a contract of hers.

Q. What did she say about it? A. I says, 'That is your privilege to withdraw your contract at any time, if you don't wish to sell your property.'

Q. After she had said something about withdrawing the contract? A. No, sir. When she said that she didn't want anyone sent to the house during this time. She thought that as I held a contract with her that I would enforce her to show the property during that time.

Q. You said that she could withdraw the contract, did you? A. Yes."

Testimony on the question as to whether defendants in error were the procuring cause of the sale is also conflicting.

On the part of the defendants in error Mr. Bowers testified:

"I am a member of the plaintiff firm. I know Mr. Frank Dennison. Have known him for ten or fifteen years. I am familiar with his voice. I had a conversation over the telephone with Mr. Dennison in relation to 3533 Wabash Avenue. I had one conversation with him. It was some time around early last spring. I think the last of April, I cannot just state. Mr. Dennison called up our office and I answered the tele-

phone. He told me who he was. I recognized his voice. Told me that there was a piece of property between Thirty-fifth and Thirty-sixth streets, on Wabash Avenue that we had for sale and he would like to trade it for a piece that he had on State street. I told him that I didn't know whether the property was for trade or not, but I would take the matter up and let him know. He said he would be very anxious to make the trade; that he would like to get in that location to live. I turned the information over to Mr. O'Brien.''

Mr. O'Brien testifies that a memorandum to call up Mr. Dennison by telephone was given him; that he asked for Mr. Dennison by telephone, ''and was connected with a party who answered to that name.'' On cross-examination he states, ''The way I submitted the property for sale to Mr. Dennison is that I got the communication from Bowers to call up Main 447, Mr. Dennison, corporation counsel, regarding this property. I called that number and asked for Mr. Dennison, and a party answering the telephone, gave me that as his name; that he was Dennison, assistant corporation counsel. He asked me what there was about this property—this party representing himself as Mr. Dennison. I described the property as clearly as I could and told him that we had it for sale. He wanted to know if he could trade some property that he had on State street for it. I told him he couldn't as the owner did not want to trade the property, but had it for sale. He said he would be at the office at 8 o'clock Saturday or Sunday night. The day he was to appear it rained and Mr. Dennison didn't appear. I called up Mr. Dennison and he told me that he was sorry that he had disappointed me and he would be unable to see me for a little time. I never had any personal interview with Mr. Dennison prior to the time this deal was closed, and I don't know that I ever saw him.''

May Longwich, who is in the employ of Bowers & Co., testified that she made the memorandum about Easter time and laid it on Mr. O'Brien's desk. The

memorandum read, "This is Mr. Dennison, corporation counsel, call up Main 447."

On behalf of the plaintiff in error the testimony of Mr. F. A. Dennison was offered:

"I am the Mr. Dennison who purchased the property in question. My attention was called to it by Colonel John R. Marshall, game warden and colonel of the Eighth Regiment. He is game warden under the governor. I do not remember the date my attention was called to it. Mr. Marshall was the first person who called my attention to it. That was probably in February or March, 1908. I didn't do anything after my attention was called to it. He didn't call my attention to it for me to buy it. He called my attention to it to help him buy it. He was going to buy it for himself. About two weeks afterwards I took up the matter of purchasing it myself. I took it up with Colonel Marshall. He failed to get enough money to buy it and he told me about it, and I told him I didn't have that much cash myself but that I had a house on State street and I told him if I could sell it I would buy that property. So he got me to call at the other property, and I went down and met Mrs. Simpson and her daughter and talked about it. She said she had gotten out of the notion of selling it then and had withdrawn it from the market. I didn't do anything that evening at all. I saw Mr. Roberton, who was my real estate agent, and negotiations made for the property after that were conducted by Mr. Roberton, 100 Washington street. I took it up with Mr. Roberton about two weeks after Marshall had called my attention to it. I never had a talk over the telephone with Mr. Bowers about buying this property, but I had a talk with him about selling some property. About selling my propery at 3531 State street. I had received a letter from Mr. Bowers about buying, and I called Mr. Bowers up. I didn't get him at first, but I went to his office and Mr. Bowers wasn't in. I asked where he was and they told me at the other office. I went to the other office but didn't find him. I did not tell them what I wanted to see him about. I didn't get the proper connection with him. In the meantime, another

man who had been trying to buy the house came in; that is the State street property. This man Roberton came to see me. I didn't know at that time but that he wanted to buy the house for the man next door. I told him I would sell if I got enough to buy another one equally as good. I told him what the other house had been offered to me at by Mrs. Simpson, and I said, 'Now if you can buy that house for $6,000 or $6,500, I will take $500 less for mine; $8,000 for the State street house and the other one was $7,000,' so he took up that and that was the way I got the property.''

Cross-examination.

''I never had any conversation with Mr. Bowers about 3533 Wabash avenue, nor with Mr. O'Brien. I never had any conversation with Bowers & Co., in regard to 3533 Wabash avenue. Mr. Roberton, a real estate agent, negotiated the purchase of that property for me after I had been there (to 3533 Wabash avenue) with Colonel Marshall. Marshall introduced me to Mrs. Simpson and I never went back any more, but I sent a man by the name of Roberton to buy that property. Roberton had to sell one place to buy the other. I let him sell one, provided he would buy the other with that money. I had no conversation with Bowers about 3533 Wabash avenue, nor with anybody in Bowers' office. I had a talk over the telephone several times trying to locate Bowers, but never said anything to anybody about that property.''

The Court: ''You say you received a letter from Bowers about buying what? A. 3531 State street. That was the house that I was to get money from to buy the Wabash avenue house with.''

''I never had any appointment with Mr. O'Brien. Absolutely not.''

The defendants in error offered no testimony tending to show that they had any conference with Colonel Marshall or that they in any way submitted the property to him. It clearly appears that Roberton had the transaction with Mrs. Simpson with regard to the sale of the property at 3533 Wabash avenue, and that it was part of his arrangement with Dennison that he

was to sell for Dennison the property at 3531 State street and Dennison, with part of the proceeds, was to buy the Wabash avenue property.

We have searched the record in vain for any showing that Bowers & Co. were instrumental in the sale of the property by Mrs. Simpson, and we therefore find from the record that the defendants in error were not the procuring cause of such sale. The judgment should be reversed without remanding the cause, and a judgment will be entered in this court on the finding of fact in favor of the plaintiff in error and against the defendant in error.

*Judgment reversed on finding of fact.*